# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

EDDIE H. MYLES,                )
                               )
        Plaintiff,             )  No. 15-cv-02855
                               )
v.                             )  Judge Philip G. Reinhard
                               )
NEDRA CHANDLER,                )  Magistrate: Judge
                               )  Iain D. Johnston
        Defendant,             )
and                            )
                               )
INTERNAL AFFAIRS OFFICER       )
CHRISTOPHER THOMPSON,          )
                               )
        Defendant.             )
-------------------------------)

       THE DEPOSITION OF NEDRA CHANDLER, taken before A. CHRISTINE SCHULTZ, Registered Professional Reporter and Notary Public commencing at 9:42 a.m., June 8, 2016, at Old Lee County Courthouse, 112 East Second Street, Dixon, Illinois.

A P P E A R A N C E S

Plaintiff by:   Patrick W. Spangler
                Attorney at Law
                Vedder Price P.C.
                222 North LaSalle Street
                Chicago, Illinois  60601
                (312)609-7500


Defendant by:   Jennifer M. Lutzke
                Attorney at Law
                Office of the Illinois
                Attorney General
                100 W. Randolph, 13th Floor
                Chicago, Illinois  60601


        Reported by:  A. Christine Schultz, RPR

1	Q.	Okay.

2	A.	-- and Housing Unit 31. Housing Unit 31 housed four in each cell. In the Minimum Security Unit, I don't know if we had any more than two, because they added some; but it went from 2 to 12.

6	Q.	Okay.

7	A.	All the other GP housing units, with the exception of the Healthcare Unit, were two-man cells. (Witness indicating.)

10	Q.	Okay. So I assume over the years that in your role you've had to deal with the issue of inmates fighting and violence, right?

13	A.	I did.

14	Q.	So from your perspective as the warden, you know, how would you explain, from an operations perspective, how you would deal with those issues, just generally?

18	A.	With fighting?

19	Q.	Yeah, fighting or violence between the inmates, making sure people weren't getting into fights, that kind of thing?

22	A.	Well, generally we have policies and procedures, and you have housing -- I have staff who were assigned to housing units, who were supposed to monitor and observe what's going on the housing units

1  make a decision about what needs to be done. And
2  that could include transfer of the offender saying
3  his safety is at risk. That could mean we
4  substantiated it, and we brought somebody else to seg
5  and went through the disciplinary process, or it
6  could mean we could transfer somebody else out,
7  depending on what the risk assessment or the
8  investigation found.
9      Q. Okay. So just to go back to a few of those
10 things. When you say like if an -- if an inmate were
11 to say, you know, I'm worried about this other
12 inmate, who I think could cause harm to me, and they
13 were to tell I.A. about it, or you about it, one
14 option would be, you could transfer that person or
15 the other person, right?
16     A. Yes, that could happen --
17     Q. Okay.
18     A. -- or both could stay, depending on what we
19 determined.
20     Q. Okay. Then with respect to transfer, when
21 you say "transfer," do you mean to another IDOC
22 facility?
23     A. Yes.
24     Q. Okay. Would you also transfer people to
25 different units or blocks within the -- within Dixon?

1   A.   That could happen, depending on what the
2   assessment determined.  I mean, if they felt -- I
3   mean, I would assume under that kind of scenario,
4   they couldn't really substantiate it, or inmate
5   couldn't provide any specifics and -- and felt that,
6   well, I can handle it here, it's just I want you to
7   be aware of it; then, yeah, if we think he's having a
8   problem with inmate B, then we'll take the necessary
9   steps to separate them, just as a precautionary
10  measure, not necessarily as we have been able to
11  substantiate there was an issue between these
12  inmates, but let's -- let's be a little proactive.
13  That's determined based on the assessment.
14           Sometimes they're left in the same unit
15  because it can't be substantiated, but it's generally
16  going to be dictated by how -- on what the inmate
17  says, because generally what happens, if you fear for
18  your safety, they're going to ask you that question.
19  If you say yes, then basically it's going to be told
20  to you, the only way we can protect you is to
21  segregate you from the rest of the population.
22   Q.   When you say that, "segregate you from the
23  rest of the population," does that mean; they go in
24  seg?
25   A.   They go to seg.

1  instances, they're supervised by staff; but there is
2  pass movement.
3      Q.  Okay.  Then Protective Custody Unit, is
4  that -- it sounds like you have a definition in your
5  head.  Do they have that at other --
6      A.  Maximum security facility.  I'm only aware
7  of maximum security facilities only.
8      Q.  Okay.  All right.  So they have Protective
9  Custody Units at maximum security prisons, but they
10 did not have it at Dixon?
11     A.  Correct.
12     Q.  Then you also mentioned transfer out of the
13 facility as being one option?
14     A.  Correct.
15     Q.  Okay.  How often did that happen, where we
16 had -- you know, where you had people that had issues
17 with other inmates, and they were transferred out?
18     A.  That wasn't a -- it's not a common
19 occurrence.  Even inmates who have fights, it
20 doesn't -- a transfer is not an automatic thing.
21 That's determined based on -- To answer your
22 question, it wasn't an everyday occurrence.  It
23 wasn't a weekly occurrence.  If I had to guess, maybe
24 a couple times a month, maybe.
25     Q.  Okay.

1      A.    Three times a month maybe, maybe.

2      Q.    How long did Thompson work at the facility

3  while you were warden?

4      A.    He was there the whole duration.

5      Q.    The whole time.  Okay.

6            All right.  Are you familiar with Mr.

7  Myles?

8      A.    I know the name.

9      Q.    Do you know him, like, by face?

10     A.    No.

11     Q.    Okay.  Have you reviewed the Complaint?

12     A.    I read the Complaint.

13     Q.    Okay.  What's your understanding of his

14 claims?

15     A.    That he was threatened -- Well, he was in a

16 fight with Inmate Shepard, I believe was the name.

17 After the altercation, released from seg, Shepard

18 threatened, continued to threaten him; that he

19 notified I.A.

20           He was assaulted by Shepard.  There was

21 an incident between him and Shepard, he alleges it's

22 assault, and nobody did anything about his threats of

23 harm.

24     Q.    Okay.  Do you recall the -- the issues that

25 he had with Shepard?

1    A.   I remember -- The only thing I recall is
2  when the two inmates were in a fight and -- well, an
3  alleged fight in Housing Unit 60 over a low bunk.
4    Q.   Okay.  So you recall the fight that
5  occurred -- Well, let me go back.
6         So you mentioned that he was in a
7  previous fight with Mr. Shepard, right?
8    A.   Correct.
9    Q.   Are you aware that he was in a -- let me
10 say this the right way, so you can answer it -- that
11 Mr. Myles alleges that Mr. Shepard attacked him in
12 the yard subsequent to that?
13   A.   I'm aware of that, yes.
14   Q.   Okay.  Do you recall that?  Were you
15 involved in --
16   A.   No, I don't recall it.
17   Q.   Okay.  If an inmate were to tell Internal
18 Affairs about, you know, a threat to themselves, or
19 they thought there was a threat to themselves, would
20 you always find out about it?
21   A.   Not always.  Not always.  I can't say
22 always.
23   Q.   Okay.  Do you recall Mr. Myles informing
24 you, via letter or any other communication, prior to
25 the fight on the yard, that he was having issues with

1  Mr. Shepard?
2      A.   I do not.
3      Q.   Okay.  If you received a direct communica-
4  tion from an inmate, like in a letter format, where
5  would that document go?
6      A.   If it actually was placed in the mail and
7  it came through institutional mail to my office, my
8  secretary actually reviewed my mail and sent it to
9  the approp -- if it was something that needed to be
10 dealt with, she would deal with it, if it was within
11 her ability to deal with, or she would assign it or
12 send it to the appropriate department head to
13 address.  I don't always get inmate mail.
14     Q.   Okay.  Do you recall receiving any inmate
15 mail from Mr. Myles about Mr. Shepard?
16     A.   I do not.
17     Q.   Okay.  Do you recall having any conversa-
18 tions with Mr. Myles about the assault on the yard by
19 Inmate Shepard?
20     A.   I do not.
21     Q.   Either before or after?
22          MS. LUTZKE:  I'm just going ask you to
23 clarify.  Are you talking about -- because I think he
24 alleges he was assaulted twice; so which assault are
25 you referring to?

1    Q.   Okay.  Do you recall having any conversa-
2  tions with Mr. Thompson about these issues between
3  Mr. Shepard and Mr. Myles?
4    A.   I do not.
5    Q.   Okay.  If an inmate writes Internal Affairs
6  or communicates with Internal Affairs about a
7  potential threat by another inmate, is there like a
8  file opened?  You mentioned a ticket before.  Is
9  there like a ticket opened, and then require
10 follow-up?
11   A.   No.  A ticket is an inmate disciplinary
12 report.  That's about discipline.
13        If an inmate writes to I.A. under the
14 circumstances you just described, I -- an investiga-
15 tion is not always opened.  There may be an inquiry,
16 where they'll go and talk to the inmate to determine
17 if there's an issue.  It may stay at an inquiry
18 level.  It may promote to, I don't know the correct
19 word at the moment -- to investigation.
20   Q.   Okay.
21   A.   If they receive a request, they generally
22 do an inquiry, and it may result in an investigation,
23 depending on what the inquiry ends up showing or
24 revealing.
25   Q.   Okay.  So do you know if there was an