# TAB 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

EDDIE H. MYLES,                    )

             Plaintiff, )

    v.                             ) Case No. 15 C 2855

NEDRA CHANDLER and                 )

INTERNAL AFFAIRS OFFICER   )

CHRISTOPHER THOMPSON,      )

             Defendants. )

        The videoconference deposition of

EDDIE H. MYLES, called for examination, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken remotely, via

videoconference, by CHERYL E. NICHOLSON, CSR No.

084-001932, a Notary Public within and for the

County of DuPage, State of Illinois, and a

Certified Shorthand Reporter of said state, at the

Illinois Department of Corrections, James R.

Thompson Center, 100 West Randolph Street, Suite

4-200, Chicago, Illinois 60601, on Monday, the 9th

day of May, A.D. 2016, at 10:02 a.m. CDT.

1      A.    That's about it.

2      Q.    Did you ever go to the yard with other

3 units at Dixon?

4      A.    Yes.  Yes, I did.

5      Q.    Was that information on the sheet?

6      A.    Yes, it was.

7      Q.    What time frame was the gym schedule

8 for?

9      A.    It varied from 9:30, I would say, from

10 8:30 to 9:30.  Then, the next day, it may be from

11 9:00 o'clock to 10:15.

12     Q.    What was --

13     A.    And the next day, something else.

14     Q.    Was the schedule for the entire month,

15 or was it weekly?

16     A.    It was -- it was biweekly.

17     Q.    Do you know what day the schedule was

18 posted?  Day of the week.

19     A.    No, I don't.  Probably, at the first of

20 the month, they change it, first and the middle of

21 the month.

22     Q.    Who was the warden when you were

23 incarcerated at Dixon in 2013?

24     A.    Warden Nedra Chandler.

Page 15

1      A.     I used to see her on the yard sometimes,

2  and I'd speak to her.  That's basically it.

3      Q.     Do you recall when you spoke with her in

4  the yard?

5      A.     No.  It -- it's -- it was a long time

6  ago.

7      Q.     Do you recall any of the contents of the

8  conversations that you had with Nedra Chandler in

9  the yard were?

10     A.     I just spoke to her.  That's it.

11     Q.     Did you ever speak with her about the

12  incident in this case?

13     A.     No, ma'am, but I wrote her a letter.

14     Q.     When did you write her a letter?

15     A.     I wrote her a letter in, uh -- what? --

16  after I got out of Segregation, in February of

17  2013.

18     Q.     Did you write the letter yourself?

19     A.     Yes, I did.  I wrote her and Mr.

20  Thompson a letter about me being threatened by

21  Milton Shepherd.

22     Q.     What did you say in your letter to Nedra

23  Chandler?

24     A.     I basically told her that the same guy

1    that I had the altercation with about me havin' a

2    bottom bunk permit was threatenin' me and tellin'

3    guys what he was gonna do to me and sendin' me

4    throats by other guys, and sometimes I would see

5    him out walkin', goin' somewhere, and, from a

6    distance, he'd threaten me, up close, he would

7    threaten me -- officers heard it, inmates heard

8    it -- and a lot of times, I'd just ignore him and

9    keep walking.

10        Q.    What correctional officers heard these

11   threats?

12        A.    Several of 'em.  I can't recall all of

13   'em's name, ma'am.

14        Q.    Can you recall any of their names?

15        A.    Officer Yarborough.  A few lieutenants

16   heard him.

17        Q.    Okay.  Do you know the names of those

18   lieutenants?

19        A.    I -- I really can't recall.  It's --

20   it's been awhile.

21        Q.    And where were you housed when you wrote

22   this letter to Nedra Chandler?

23        A.    I -- I was housed in Unit 58.

24        Q.    Do you know where Milton Shepherd was

1   housed?

2        A.    I found out, afterwards, he was housed

3   in Unit 31, after I was released from Seg.

4        Q.    Okay.  So when you wrote the letter to

5   Nedra Chandler, were you housed in Segregation

6        A.    No, ma'am.  I was in General Population.

7   That's Unit 58.

8        Q.    Okay.  I just have a follow-up question

9   on the yard.  Are inmates required to attend the

10  yard?

11       A.    No, ma'am.  That's -- you can go, if you

12  want to.  If you don't, you don't have to.

13       Q.    Would you agree that attending yard is a

14  voluntary undertaking?

15       A.    Yes.

16       Q.    And how did you send the letter to Nedra

17  Chandler?

18       A.    I put it in a box to the warden.  And

19  put Mr. Thompson's in his box, to Internal Affairs.

20       Q.    Okay.  We'll get to Mr. Thompson in a

21  second.  Right now, I'm just going to ask you

22  questions about Nedra Chandler.

23       A.    Okay.

24       Q.    Where is the box for the warden located?

Page 18

1       A.      In the unit.

2       Q.      Did you personally put the letter in the

3   box?

4       A.      Yes, ma'am, I did.

5       Q.      Did you make a copy of the letter?

6       A.      I rewrote the same letter that I wrote

7   to Warden Chandler, to Mr. Thompson.

8       Q.      Do you personally still have a copy of

9   the letter you wrote to Nedra Chandler?

10      A.      No, ma'am, I don't.

11      Q.      Is it fair to say, then, you didn't make

12  an actual photocopy of that letter?

13      A.      No, I didn't.

14      Q.      Was anyone else present when you put the

15  letter in the box?

16      A.      No, ma'am.

17      Q.      What time of day did you place the

18  letter in the warden's box?

19      A.      It was in the afternoon.

20      Q.      Do you remember what time?

21      A.      No, ma'am.

22      Q.      Did you ever receive a response to your

23  letter?

24      A.      No, I didn't.

Page 24

1    top so I could get mine in and put, situate my

2    stuff.

3         Q.    Okay.  And at Dixon Correctional Center,

4    there's a correctional officer who sits in a bubble

5    on the housing unit?

6         A.    There's two of 'em, two officers.

7         Q.    Where are the two officers located?

8         A.    Sittin' in the bubble up front in the

9    day room.

10        Q.    And you can speak to the correctional

11   officer in the bubble, right?

12        A.    Yes.

13        Q.    Okay.  And when's the next time that you

14   had issues with Inmate Shepherd?

15        A.    To be honest with you, it was -- it was

16   daily.  He was real upset about having to move to

17   the top bunk, and every day, it was like, you know,

18   he was trying to bully me and threaten me and

19   talkin' crazy, so I would ignore him 'cause I know

20   he was a young guy, and I used to tell him, "I'm

21   not gonna keep lettin' you stand here and threaten

22   me, you know.  If I have to go to the warden or

23   Internal Affairs, I will."  And then he stopped for

24   a while, after I started fixing some food and

```
 1   sharing some food with him.  But I -- I realized

 2   then that as long as I'm feeding him, he's okay;

 3   when I don't feed him, and I just fix me somethin'

 4   to eat, it's a problem.

 5        Q.    Did you ever request to be moved from

 6   that cell?

 7        A.    I talked to the officers that was

 8   workin' the wing on several occasions.  And I

 9   didn't ask to be moved; I just told them it was a

10   problem with me and my cellie, that he keep

11   threatenin' me.  And -- and they talked to him a

12   couple of times, and, uh, I don't know what

13   happened after that.

14        Q.    What correctional officers did you speak

15   with?

16        A.    I spoke to, uh -- uh, the last two

17   officers I spoke to about this incident was Officer

18   Daniels, uh, and, uh . . .  What had happened was,

19   Shepherd came to me one day.  I was in the day

20   room, and he came to me and asked me, could we

21   talk?  I said yeah.  We went to the cell, and he

22   tells me, "I talked to the officers on the 7 to 3

23   shift and asked them, Did anybody in this cell have

24   a bottom bunk permit?, and they told me no, so you
```

1    lied to me, your permit is bogus," and this, this,

2    this and that, and he started cursing.  And I said,

3    "Hold it.  Wait a minute.  Let's go talk to the COs

4    right now, 'cause I moved over here from 61."  I

5    went up front.  I talked to CO Daniels, explained

6    the situation as best I could.  It was a lady

7    officer workin' in the bubble with him.  He asked

8    her to call 61, first, Unit 61 -- that's where I

9    got transferred from 61 to 60 -- to see if I had a

10   bottom bunk permit over there.  And whoever she

11   talked to, she got off the phone, and then she

12   called the Health Care Unit and found out that my

13   bottom bunk permit was valid, it was good.  And she

14   hung up the phone and told me and Milton Shepherd

15   that.  She really was talking with Milton Shepherd.

16   And she told him, "His bottom bunk permit is good.

17   He's over 60 years old.  Leave this man alone about

18   that bottom bunk.  I'm gonna call the lieutenant

19   and have you walked to Seg."

20        Q.    Who said that?

21        A.    The lady that was workin' with Officer

22   Daniels on -- on 1-28-13.

23        Q.    Do you know her name?

24        A.    I can't remember her name, but the

```
 1    told internal Affairs or whoever was investigatin'

 2    that Shepherd swung on me, first, I didn't swing on

 3    him first.  And then Mr. Thompson came over to Seg

 4    and wanted to . . .  And I think this was around

 5    the 4th, maybe the 2nd or 3rd.  And he -- first, he

 6    apologized to me for not walkin' all of the -- not

 7    walkin' Shepherd to Seg as well as myself and the

 8    staff not takin' both of us to Seg, puttin' us

 9    under investigation status, if nothin' else.  And

10    then he told me, after talkin' to the guys in the

11    unit and realizing that more of them is sayin'

12    Shepherd swung on me first, that, uh, he wasn't too

13    happy with me bein' in Segregation and Shepherd

14    bein' in Population, but the only reason he -- they

15    did this was because Shepherd was out in

16    Population, talkin' about suin' the warden and

17    writin' up a lawsuit and pressing charges on me,

18    and then they went, locked him up and put him in

19    Seg.  And they changed the assault to threats and

20    intimidation ticket to just a writing ticket and

21    they gave us both of us 20 days in Seg, 20 days in

22    Segregation.

23         Q.    Prior to February --

24               Well, what was the date of that
```

1      Q.   And what happened during that

2  conversation?

3      A.   He came to the cell and apologized to me

4  for not lockin' both of us up.  Uh, I mean, for not

5  really doin' a thorough investigation as far as

6  what had actually happened, because guys in

7  Population, over there in the unit we was in, when

8  they -- when Internal Affairs -- went over there

9  talkin' to different guys, a lot of the guys in

10  Population and, uh, guys that was out of our unit

11  was tellin' them that Shepherd attacked me on the

12  yard, that I didn't initiate that.  And he talked

13  to Inmate Walker, Inmate Scott.  They were sittin'

14  on the yard with me, the day the second incident

15  happened and I was assaulted by Shepherd.

16      Q.   Okay.  I just want to stop you there.

17  So he came to your cell, was apologizing for not

18  doing a thorough investigation of the first

19  incident or the second incident?

20      A.   Both.

21      Q.   Was there anyone else present for this

22  conversation?

23      A.   No, ma'am.

24      Q.   Did he say anything else?

Page 37

1    A.    No, ma'am.  He just told me -- he just

2    basically apologized for me having to go through

3    this with this young guy, all over me having a

4    bottom bunk permit.

5    Q.    Other than the conversations that you

6    had with Christopher Thompson, did you ever

7    interact with him otherwise, by writing him a

8    letter or anything?

9    A.    Yes.  I did write him a letter.

10   Q.    How many letters did you write him?

11   A.    I didn't write him but one.

12   Q.    You wrote him one letter?

13   A.    Yes, ma'am.

14   Q.    When did you write that letter?

15   A.    I wrote him about the same time I wrote

16   Warden Chandler.

17   Q.    Do you recall the date?

18   A.    No, ma'am.  I honestly can't remember

19   the date.  It was after I got out of Segregation,

20   though.

21   Q.    When were you released from Segregation?

22   A.    I would say around the 20th.  Maybe the

23   17th of April.

24   Q.    Did you ever write to him prior to the

1    they had a hotline.

2        Q.    When you say that you didn't write any

3    letters to Officer Thompson before the second

4    incident, are you talking about relating to

5    anything, including being a confidential informant,

6    or are you just talking about issues that you were

7    having with Inmate Shepherd?

8        A.    Hold it.  Say that again.

9        Q.    Okay.

10            Previously, you testified that you never

11   wrote any letters other than that one letter to

12   Officer Thompson.

13            Well, strike that.

14            Actually, previously, you testified you

15   didn't write any letters until after the second

16   incident involving Inmate Shepherd, and I just want

17   to clarify your testimony.  Is it your testimony

18   that you never wrote him any letters about anything

19   prior to the second incident?

20       A.    No, I didn't.

21       Q.    Okay.

22       A.    Excuse me, but you said somethin' about

23   an informant?

24       Q.    Right.  I just have a copy of a letter

1    that's dated February 11, 2013, that appears to be

2    signed by you, sent to Officer Thompson.  Do you

3    have any recollection of writing that letter?

4        A.    What does that letter say?

5        Q.    Well, I'm just asking you.  Do you have

6    any recollection of writing a letter on February

7    11, 2013, to Officer Thompson?

8        A.    I may have wrote him.  I honestly

9    can't -- can't recall.

10       Q.    Do you recall writing Officer Thompson a

11   letter on February 12, 2013?

12       A.    I honestly can't recall.

13       Q.    Have you ever served as a confidential

14   informant within the Illinois Department of

15   Corrections?

16       A.    No, I haven't.

17       Q.    Did you ever speak with Officer Thompson

18   about being a confidential informant?

19       A.    Yes, I did.

20       Q.    Do you recall writing a letter to

21   Officer Thompson on March 3, 2013?

22       A.    Concerning what?

23       Q.    Well, my question is general.  Do you

24   recall writing a letter on March 3, 2013, to

Page 41

1    Officer Thompson?

2         A.    I honestly can't recall.

3         Q.    Okay.  Do you ever recall writing a

4    letter indicating that "Several guys I know have

5    come up to you and said, 'Whenever you see your

6    ex-cellie, watch him, because he's talking about

7    what he's gonna do to you when he catches you right

8    over in the gym, so be careful'"?

9         A.    Yeah.

10        Q.    Okay.  And --

11        A.    I do.

12        Q.    And do you recall writing in that letter

13   that you looked at the yard and gym schedule and

14   saw that your old cellmate, Shepherd, was going to

15   be on the yard with you?

16        A.    I honestly can't recall that.

17        Q.    Okay.  Did you ever look at the yard

18   schedule and see that Shepherd's housing unit was

19   going to the yard at the same time as yours?

20        A.    Yes, I did.

21        Q.    Okay.  And did you choose to attend the

22   yard, anyway?

23        A.    Yes, I did.

24        Q.    Okay.  And it's fair to say, at that

Page 52

1    like Shepherd initiated both confrontations and

2    both physical contacts.  Other than the people who

3    told, told Internal Affairs that I was assaulted

4    and attacked by Shepherd on both occasions, other

5    individuals was tellin' him the same thing, and

6    these individuals was in the unit I was in, in Unit

7    60.

8         Q.    Did you lose good time?

9         A.    Yes, ma'am.

10        Q.    Have you -- has that good time been

11   restored?

12        A.    No, it hasn't.  They gave me 30.  30

13   days across the board, with a disciplinary

14   transfer.  But the transfer was later stopped, and

15   instead of transferrin' me, they transferred

16   Shepherd, after Lieutenant -- after -- after Mr.

17   Thompson told Warden Chandler that after doin' this

18   investigation, he felt like Shepherd was the

19   problem.  So they shipped Shepherd and left me in

20   Dixon.

21        Q.    Did Shepherd have any injuries as a

22   result of the incident on May --

23        A.    I honestly can't tell.

24        Q.    -- or, March -- 28, 2013?

Page 56

1    Chandler and Thompson were aware of Shepherd's

2    prior, prior assault on plaintiff in January 2013.

3    What facts do you have to support that assertion?

4        A.    Both of them knew what was happenin',

5    because the Adjustment Committee summary sheets --

6    I'm pretty sure, both of them got a copy of that,

7    'cause the warden signed off on 'em.  Even if Mr.

8    Thompson didn't sign off on it, I'm pretty sure he

9    was aware of what happened as a result of that

10   altercation and that assault that occurred.

11       Q.    Do you have any other facts?

12       A.    No, I don't.

13       Q.    In paragraph 25, you assert, "In the

14   letters to Thompson and Chandler, Plaintiff

15   detailed the physical abuse and threats from

16   Shepherd and stated that he feared for his safety."

17       A.    Yes, I did.

18       Q.    What letters are you referring to?

19       A.    The letters that I sent to Warden

20   Chandler and Mr. Thompson.

21       Q.    In paragraph 26, you assert that "No

22   action was taken by Thompson, Chandler, on any of

23   their stuff to separate Plaintiff from Shepherd or

24   to take any action to protect Plaintiff from

Page 69

1    relation to the second incident with Shepherd, when

2    you sent the letters to Mr. Thompson and Miss

3    chandler?

4        A.    Oh.   That was, uh, after the first

5    altercation and we was released from Segregation

6    and the threats started comin' to me by way of

7    other inmates and him sendin' people to tell me

8    what he was goin' do to me.   That was, uh, maybe --

9    maybe two or three times after I had got out of

10   Seg, which was after the 17th.   That was in April.

11       Q.    So, the occurrence, though.   Did you --

12   did you send the letters to Mr. Thompson and Miss

13   Chandler in March 2013, prior to the March 28, 2013

14   incident?

15       MS. LUTZKE:   I'm going to object to form.

16   Misstates his prior testimony.

17   BY THE WITNESS:

18       A.    No.   I sent those before.

19   BY MR. SPANGLER:

20       Q.    What is your best guess as to when?

21   When did the second incident with Shepherd occur?

22   Based on your memory, occur.

23       A.    3-28-13.

24       Q.    Okay.   Did you send the letters that you

Page 70

1   mentioned to Mr. Thompson and to Miss Chandler

2   prior to March 28, '13?

3       A.    Yes, I did.

4       Q.    Okay.  When is your beast guess as to

5   when you sent those letters?

6       A.    Maybe a week after I was out of

7   Segregation.

8       Q.    Which was when?

9       A.    That was around February 17th.

10  Somewhere around there.

11      Q.    Okay.  So, between February 17th and

12  March 28, 2013, that's when you think you sent the

13  letters?

14      A.    Yes.

15      Q.    Okay.  And then, when you were

16  testifying that you spoke with the video

17  doctor -- ?

18      A.    That was on 3-26.

19      Q.    Okay.  And during that, you -- during

20  that meeting with the video doctor, you mentioned

21  sending the letters?

22      A.    Yes.

23      Q.    Okay.  And then you mentioned, also,

24  that you had a conversation with Mr. Thompson after

```
 1   the March 28th incident, correct?

 2       A.    Yes.

 3       Q.    And when did that occur?

 4       A.    That was, uh, while I was in

 5   Segregation.  He came over there, and, uh, we

 6   talked.  It could have been -- I think that was --

 7   a week, two weeks after I was back there.

 8       Q.    Okay.  So, after the March 28th

 9   incident, when you were in Segregation?

10       A.    Yes.

11       Q.    Okay.  So, at some point in early April,

12   early to mid-April 2013?

13       A.    Yeah.

14       Q.    Okay.  And when you spoke with Mr.

15   Thompson, did he reference the letters that he had

16   received during that conversation?

17       A.    Yes, he did.

18       Q.    Okay.  What did he say about the letter?

19       A.    He told me, "I apologize for not gettin'

20   on top of this, but somethin' came up that was

21   urgent, and it -- and it needed my attention."  He

22   apologized for not honoring my letter and gettin'

23   on top of it or puttin' somebody on top of the

24   situation, and he -- he -- he really apologized and
```

1  just said, "I'm sorry about that.  Maybe if I had

2  did something before now, this wouldn't have

3  happened, but I didn't get around to sendin' nobody

4  to talk to Shepherd, or I didn't get to talk to

5  him."

6      Q.    Okay.  And did he say anything else that

7  you recall other than what you testified about

8  today?

9      A.    Nothin' other than apologized to me.

10      Q.    Okay.  And then what about Miss

11  Chandler?  You said you spoke to her, with her as

12  well.

13      A.    Yes.  She came by, after.  After Mr.

14  Thompson had talked to me and told me that, uh, he

15  talked to Warden Chandler concernin' him doin' a

16  thorough investigation, and, uh, he expressed to

17  her that it was his decision that after talking

18  with other people that wasn't involved with this

19  situation, that Shepherd initiated both contacts

20  and both physical altercations with me, and that,

21  uh, he felt like Shepherd should be transferred and

22  not me.  So, the warden, out of what he said,

23  'cause three, maybe two days after he came, talked

24  to me, she came in my door and was tellin' me

1    A.    Yes.

2    Q.    Okay.  And you mentioned you had a knot

3    on your head and you had some injuries to your face

4    and to your eyes.

5    A.    Yes.

6    Q.    Okay.  Okay.  Did you have any

7    impairment and/or damage to your vision as a result

8    of that altercation?

9    A.    Yes.  I'm taking eyedrops now.

10   Q.    And how did it impact your vision?

11   A.    My vision gets blurry sometimes.  Even

12   though I wear glasses, from time to time, my vision

13   is blurry.  And the last time I talked to the

14   doctor, who put me on the eyedrops, he was asking

15   me, had I been hit upon, been in a lot of fights?

16   I said, no, not really, not except for an

17   altercation that happened in Dixon, and I brought

18   it to his attention that I was hit in my face quite

19   a bit and kind of hard.  And he told me he was

20   gonna put me on a medication for my eye.

21   Q.    Okay.  And is your vision still affected

22   now?

23   A.    Yes, it is.

24   Q.    Anything else that you're still -- any