# TAB 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

```
EDDIE H. MYLES,              )
                             )
        Plaintiff,           )  No. 15-cv-02855
                             )
v.                           )  Judge Philip G. Reinhard
                             )
NEDRA CHANDLER,              )  Magistrate: Judge
                             )  Iain D. Johnston
        Defendant,           )
and                          )
                             )
INTERNAL AFFAIRS OFFICER     )
CHRISTOPHER THOMPSON,        )
                             )
        Defendant.           )
-----------------------------)
```

      THE DEPOSITION OF CHRISTOPHER THOMPSON, taken before A. CHRISTINE SCHULTZ, Registered Professional Reporter and Notary Public commencing at 11:38 a.m., June 8, 2016, at Old Lee County Courthouse, 112 East Second Street, Dixon, Illinois.

A P P E A R A N C E S

Plaintiff by:   Patrick W. Spangler
                  Attorney at Law
                  Vedder Price P.C.
                  222 North LaSalle Street
                  Chicago, Illinois  60601
                  (312)609-7500

Defendant by:   Jennifer M. Lutzke
                  Attorney at Law
                  Office of the Illinois
                  Attorney General
                  100 W. Randolph, 13th Floor
                  Chicago, Illinois  60601

Reported by:   A. Christine Schultz, RPR

1    Q.    Anything else?
2    A.    Wow, there's a -- there's a million things. I mean basically handling everything that the normal officer doesn't handle.
5    Q.    Okay. So is it fair to say you'd -- you would investigate and handle complaints related to potential violence or threats related to inmates to other inmates?
9    A.    Correct.
           When you say "investigate," you're implying that there's an official investigation, but only the warden can initiate that or request that.
13   Q.    Okay.
14   A.    I may look into them but, you know, when you say "investigate," if it's an official investigation, it has to come from the warden.
17   Q.    Okay.
18   A.    I just want to make sure we're clear on how it worked.
20   Q.    Yeah, that may -- may be somewhat of the words I'm using. I'll come back to that in a little bit, but you may be involved in inquiries --
23   A.    Sure.
24   Q.    -- involving inmate versus other inmate threats or violence?

```
 1      A.   Yes.
 2      Q.   Okay.  It also would include inmates and
 3 guards, I assume?
 4      A.   Yes --
 5      Q.   Okay.
 6      A.   -- to an extent.
 7      Q.   Okay.  Who did you report to?
 8      A.   Warden Chandler.
 9      Q.   Okay.  Was there -- There's another
10 individual in Internal Affairs that was like a
11 sergeant or something.  I can't remember what the
12 term is.
13      A.   At that time, it may have been Lieutenant
14 Bonnie Smith --
15      Q.   Okay.
16      A.   -- but there's been so many lieutenants,
17 I'm...
18      Q.   What about Sage?
19      A.   He was a lieutenant in Internal Affairs,
20 but I'm not sure if that time frame is correct.
21      Q.   Okay.  Okay.  Would you -- whether it was
22 Smith or Sage, would you have reported to someone
23 internally in I.A. that was, like, you considered a
24 superior to you?
25      A.   One of those two people, yes.
```

1 always tell Ms. Chandler?
2   A.  Not always, no.
3   Q.  Okay.  What about with respect to the
4 lieutenant in I.A.?
5   A.  Not always, no.
6   Q.  Okay.  When you conducted inquiries or
7 investigations, however you want to define it, was it
8 generally just you doing it?
9   A.  Sometimes, yes.
10  Q.  Okay.  Then what other situations?  Who
11 else would be involved?
12  A.  Sometimes there's intel officers that also
13 have reports to do on fights and assaults, so they
14 may be present, too.
15  Q.  Okay.  Did you deal with -- we talked with
16 Ms. Chandler about K.S.F. -- K.S.F.'s and
17 transfers --
18  A.  Uh-huh.
19  Q.  -- do you know what I mean by those terms?
20  A.  Yes.
21  Q.  Did you have authority to make a transfer
22 or issue a K.S.F. on your own?
23  A.  No, sir.
24  Q.  Who would have had to approve that?
25  A.  Typically it's initiated through the

1  had a medical issued lower bunk permit which forced
2  Mr. Shepard to the top bunk, which created issues,
3  created an argument, turned into a physical alter-
4  cation.
5           Mr. Shepard retreated from the wing to
6  the control room area or day room area, followed by
7  Mr. Myles, in an aggressive manner, where the officer
8  observed Mr. Myles -- I'm not sure if he was swinging
9  on him or just saying he was going to harm him. And
10 that resulted in his two disciplinary offenses of
11 assault and intimidation of threats.
12      Q.  Okay. What you just described, like, did
13 you -- you weren't there, right?
14      A.  No, sir.
15      Q.  Okay. So you would have learned that
16 through reports and things generated?
17      A.  Reading -- reading his inmate disciplinary
18 report and talking to Mr. Myles.
19      Q.  Okay. What was your role in investigating
20 that -- did you have a role in investigating that
21 incident?
22      A.  I did.
23      Q.  Okay. Was that -- Were you assigned to
24 that because -- were you assigned to investigate that
25 for disciplinary purposes as it related to Shepard

```
 1              So do you recall getting this letter?
 2       A.   No, sir.
 3       Q.   Okay.  Do you deny receiving it --
 4       A.   No.
 5       Q.   -- or you just don't remember?
 6       A.   I don't remember when I received it.
 7       Q.   Okay.  If -- if this was sent to you, and
 8  we have it through the Illinois Department of Corr --
 9  Well, let me ask you this:  Did you obtain this
10  document and give this to your attorney?
11       A.   Yes.
12       Q.   Okay.  Where was the document located?
13       A.   My office.
14       Q.   Okay.  Were all of these letters in a
15  file --
16       A.   Yes.
17       Q.   -- in your office?
18       A.   Yes.
19       Q.   Okay.  Do you have files with particular
20  inmate letters?
21       A.   I'm not sure what you mean, but, yes.
22       Q.   Okay.  Do you have more than one file --
23       A.   Yes.
24       Q.   -- organized by inmate?
25       A.   Yes.
```

1       A.      I don't recall.

2       Q.      Before the first fight?

3       A.      No.

4       Q.      Was it related to the first fight?

5       A.      I'm not sure if it was the first or second.

6       Q.      Okay.

7       A.      I haven't read it in three years.

8       Q.      Yeah, no, I understand.

             Do you know if you received that before
10  or after you received the March 3rd letter, or you
11  don't know?

12      A.      I don't recall when I received it.

13      Q.      Okay.  Now, in here in this letter dated
14  March 3rd, 2013, you know, Mr. Myles is informing you
15  that other inmates are saying that Mr. Shepard is
16  talking crazy about him and saying he's going to do
17  something to him in the yard or the gym?

18      A.      Correct.

19      Q.      Okay.  Does the -- does the substance of
20  the letter, do you recall receiving that information
21  around this time frame?

22      A.      No.

23      Q.      Okay.  If you had received this letter on
24  March 3rd, 2013 -- Well, let me go back.

             Was there a time around this time frame,

1  March 3rd, 2013, where you learned that Mr. Myles had
2  concerns about his safety as related to Mr. Shepard?
3      A.   No.
4      Q.   Prior to the incident on the yard?
5      A.   No.
6      Q.   Okay. So outside of this letter, you don't
7  believe you learned through any other communication
8  that Mr. Myles had concerns about his safety?
9      A.   No.
10     Q.   Okay. Did you do anything after March 3rd,
11 2013, to address Mr. Myles' concerns about his
12 safety?
13     A.   No.
14     Q.   Why not?
15     A.   I don't believe it for a second.
16     Q.   Don't believe what?
17     A.   That he feels that he is going -- Well, to
18 begin with, what is -- I shouldn't ask questions.
19          I don't believe that he thought for a
20 second that he was in jeopardy.
21     Q.   Why not?
22     A.   By -- by how he acted and how he acted in
23 both fights.
24     Q.   When you say "both fights, you mean the
25 yard incident, the second one you're referring to?

1    A.    Correct.

2    Q.    Okay.  You wouldn't have known about that
3 at the time?

4    A.    No.

5    Q.    Yeah.  So what's in this -- you know, after
6 March 3rd, 2013, though, you're saying you don't
7 remember receiving this letter, you don't recall
8 receiving any information that suggested that
9 Mr. Myles felt that his safety was threatened by
10 Mr. Shepard, right?

11    A.    Correct.

12    Q.    Okay.  I was asking you, you know, if you
13 had that information, why you didn't do anything?

14    A.    Correct.

15    Q.    Okay.  Then you said I didn't believe -- I
16 wouldn't have believed it, right?

17    A.    Correct.

18    Q.    Okay.  Then you referred to because of how
19 he acted in the first fight -- well, you said the
20 second fight, but --

21    A.    Okay.  The first fight.

22    Q.    The first fight.

23        What do you mean by that?

24    A.    He was the aggressor.

25    Q.    Okay.  I mean, you checked that down and

1  sation with Myles in segregation after the second
2  incident?
3      A.  Yes, sir.
4      Q.  Okay.  What do you recall saying to him,
5  and what did he say to you?
6      A.  He just basically told me that him and
7  Shepard got into it again.  I don't remember exactly
8  what he said.
9      Q.  What did you say to him?
10     A.  I don't recall exactly.
11     Q.  Did you acknowledge receiving the March 3rd
12 letter during this conversation?
13     A.  Not that I recall.
14     Q.  Okay.  No, or you don't remember?
15     A.  I don't -- I don't remember.
16     Q.  Okay.  Do you recall telling Mr. Myles that
17 you were sorry that you didn't do anything in
18 response to the March 3rd, 2013, letter?
19     A.  No, sir.
20     Q.  Okay.  Do you deny saying that, or you
21 don't remember?
22     A.  I don't remember saying that.
23     Q.  Okay.  Do you recall saying anything else
24 to Mr. Myles during that conversation?
25     A.  No, sir.

1  running around saying he was going to attack Myles?
2      A.  No.
3      Q.  Okay.  Why didn't you believe that?  Or I
4  guess we should -- Let me clarify.
5          You don't recall receiving this, right?
6      A.  I received it; I don't recall when.
7      Q.  Okay.  So you do recall receiving it, you
8  just don't know when?
9      A.  Correct.
10     Q.  Okay.  Before when we were talking you
11 mentioned that you didn't -- you didn't recall
12 Mr. Myles raising any issue about his safety as it
13 related to Mr. Shepard to you prior to the second
14 incident?
15     A.  Correct.
16     Q.  You do -- you do recall receiving the
17 letter, you just don't know when?
18     A.  Correct.
19     Q.  Okay.  As we're sitting here now, looking
20 at it, you don't believe that Mr. Shepard was making
21 statements suggesting that he was going to assault
22 Mr. Myles?
23     A.  No, sir.
24     Q.  Is that why you didn't do anything about
25 it?