IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Eddie H Myles (A-71068), | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 15 C 2855 |
| | ) | |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Nedra Chandler, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the following reasons, defendants' motion for summary judgment [40] is denied. At the next hearing, the parties are to discuss with Judge Johnston the possibility of a settlement conference.

## STATEMENT-OPINION

On August 28, 2015, plaintiff Eddie H. Myles filed his first amended § 1983 complaint against defendants Warden Nedra Chandler and Officer Christopher Thompson [19], alleging that defendants violated his constitutional rights by failing to protect him from assault by another inmate.

On September 15, 2016, defendants Warden Chandler and Officer Thompson filed a joint motion for summary judgment [40], memorandum in support [41], and Rule 56.1 statement of facts [42]. Defendants contend that plaintiff's § 1983 claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), that plaintiff has failed to raise a genuine issue of fact that defendants failed to protect him, and that defendants are entitled to qualified immunity. *See* [41]. On October 31, 2016, plaintiff filed his response to the motion [46], response to the statement of facts [47], and Rule 56.1 statement of additional facts [48], along with an additional appendix of exhibits [49]. On November 15, 2016, defendants filed their reply [52] and response to plaintiff's additional facts [51].

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the motions and the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact with respect to each motion, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to the plaintiff. *See Schepers*, 691 F.3d at 913.

A. Factual Background.

Plaintiff was an inmate incarcerated at Dixon Correctional Center during the relevant time. [47] at ¶ 1. Defendant Christopher Thompson was a Correctional Officer assigned to Internal Affairs at Dixon. [47] at ¶ 2. Nedra Chandler served as the Warden of Dixon during the relevant time. [47] at ¶ 3.

In November of 2012, plaintiff was moved into a cell with inmate Milton Shepard. [47] at ¶ 15. On January 28, 2013, plaintiff fought with Shepard during an altercation about plaintiff's bottom bunk permit, which plaintiff testified Shepard was upset about. [47] at ¶ 16; [51] at ¶ 1. Plaintiff testified that he received twenty days in segregation for fighting with Shepard. [47] at ¶ 17.

After the January altercation, [plaintiff] was threatened by Shepard. [51] at ¶ 5. Plaintiff testified that "from a distance, he'd threaten me, he'd threaten me up close, he would threaten me – officers heard it, inmates heard it – and a lot of times, I'd just ignore him and keep walking." [47] at ¶ 12. Plaintiff testified in response to questioning that he was not "afraid" of Shepard, and that he was not afraid of anyone in prison. [47] at ¶ 25. Shepard testified that, after the January incident, he was "upset" and "mad at Plaintiff" and "wanted to hit him." [51] at ¶ 6.

Plaintiff testified that sometime after the January altercation he wrote a letter to Officer Thompson, and in that letter, stated that plaintiff's former cell mate was telling other inmates that he was going to do something in the gym or in the yard; plaintiff points to the full document. [47] at ¶ 18. In full, the letter provides as follows:

[page one]

3/13/13

Greetings, Mr. Thompson,
    This is Eddie Myles #A-71068 in #58 Cell "01."
    I dropped a kite in the "Outgoing Mail Box" for you. So, this is concerning the same "thing."
    Short, brief, and to the point!
    Several guys I know have came up to "me" and said; whenever you "see" your x-cellie, watch "him" because he's "talking about what he's gonna do to you, when he "catches you right" over in the "gym." So, be "careful." Or on that "yard."
    After hearing this: I naturally looked at the "yard and gym" schedule. He's now in "31." I'm in #58. We have "yard together for sure," or at least while he's in "31" anyway.

I'm not trying to get "shot" on the yard, or "hurt." I'm giving you my word that if I do have to raise my hands at my x-cellie, I will do it "defending myself." I will try as best I can to "keep" some "distance" between us." I just "wanted" you to know my x-cellie is "talkin crazy," Hey." We'll "talk."

[page two]

Between "us" I'd rather be in a "2-Man" "Cell," but I'm OK "Where I am" for now.
I would really appreciate it if I could get back to "60" or "26"? But, if I can't "I'm cool where I am."
God knows I don't want "Any-problems."
Just thought I'd let you know "before something happens" "what" I'm "hearing." "We'll talk"…
To: Mr. Thompson.
"I.A."

[42-5].

Plaintiff also testified that he sent an identical letter to Warden Chandler and placed it in her personal mailbox; he admits he does not have a copy of the letter, and that he does not know whether that letter was ever received by Warden Chandler. [47] at ¶ 13; [51] at ¶¶ 8, 10. Warden Chandler testified that she does not recall receiving Myles' letter. [51] at ¶ 11. It is a matter of dispute whether Officer Thompson recalls reading the letter. *See* [51] at ¶ 12.

On March 28, 2013, plaintiff attended the yard. [47] at ¶ 23. Plaintiff admits that he looked at the yard schedule prior to attending and saw that Shepard was going to be on the yard with him, but that plaintiff chose to attend the yard anyway. [47] at ¶ 24. According to plaintiff, Shepard approached him and asked plaintiff to meet him behind the shack to fight. [47] at ¶ 26. Plaintiff testified that he ignored Shepard, who then walked away but returned a few minutes later, and the same thing happened. [47] at ¶ 27. Plaintiff asserts that Shepard came back a third time, pushed past plaintiff's friend, and started "swinging on" plaintiff. [47] at ¶ 28. Plaintiff testified that he stood up and slipped, but Shepard hit plaintiff approximately fifteen to twenty times until the horn went off in the yard. [47] at ¶ 29. After the horn went off, plaintiff and Shepard went back to line up to leave the yard and went back to their cell houses. [47] at ¶ 30. Plaintiff admits that he never notified any correctional officers on the yard that Shepard approached him. [47] at ¶ 31.

Plaintiff suffered injuries to his head, face, and eyes as a result of the March 28, 2013 altercation; specifically a swollen left eye, a bump on his forehead, and abrasions. [51] at ¶ 15. According to plaintiff, his vision was impacted by the altercation. [51] at ¶ 16. The altercation was ultimately discovered, and plaintiff received a disciplinary ticket for fighting, losing good time as punishment for the ticket. [47] at ¶ 32. Under the Illinois Administrative Code, an inmate commits "fighting" by "fighting with another person in a manner that is not likely to cause seriously bodily injury to one or the other and that does not involve the use of a weapon." 20 Ill. Adm. Code 504 App'x A. [47] at ¶ 33. The Adjustment Committee's basis for the decision included the statement that plaintiff admitted "to having a physical altercation with

Inmate Shepard K52138 on the GP yard" and that "Inmate Shepard stated that both he and Inmate Myles were throwing punches at each other." [47] at ¶ 34.

Although the conversation is disputed, plaintiff testified that after the March 28, 2013 incident, Officer Thompson had a direct conversation with him about the letter and his failure to take action. [51] at ¶ 17. During that conversation, Officer Thompson told plaintiff that he apologized for not honoring the letter that he received from plaintiff and not sending anyone to talk to Shepard to do a thorough investigation. *See id*. Officer Thompson stated that perhaps if he had done something, the altercation would not have happened. *See id*. Officer Thompson told plaintiff that he had not dealt with the letter because something urgent came up that required his attention. [51] at ¶ 18. After apologizing to plaintiff, Officer Thompson ultimately transferred Shepard to another facility and stopped plaintiff's disciplinary transfer. [51] at ¶ 20.

B. Analysis.

The court will first analyze defendants' argument that plaintiff's claims are foreclosed by *Heck v. Humphrey*, 512 U.S. 477 (1994). Next, the court will determine whether plaintiff has raised a genuine issue of material fact that defendants failed to protect him from Shepard. Finally, the court will consider whether defendants are entitled to qualified immunity.

I. *Heck v. Humphrey*.

Defendant's first argument is that plaintiff's claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) because, while plaintiff claims he was "assaulted" by Shepard, the Dixon Adjustment Committee found that he was guilty of "fighting" and took away good time for that infraction. The Seventh Circuit has explained that *Heck* can apply to prison disciplinary rulings:

> Under the rule of the *Heck* case, a civil rights suit cannot be maintained by a prisoner if a judgment in his favor would "necessarily imply" that his conviction had been invalid, and for this purpose the ruling in a prison disciplinary proceeding is a conviction. The *Heck* rule is analogous to collateral estoppel: an issue determined with finality in a full and fair adjudicative proceeding (and essential to the decision in that proceeding) cannot be reopened in a subsequent case. The reason for requiring that the issue have been essential is that if resolving the issue was irrelevant to the outcome of the case, there was neither incentive to challenge that resolution on appeal nor reason for the appellate court to consider such a challenge.

*Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011).

Here, defendants point out that plaintiff received a disciplinary ticket for "fighting" after the March 28, 2013 altercation. As previously noted, under the Illinois Administrative Code, an inmate commits "fighting" by "fighting with another person in a manner that is not likely to cause seriously bodily injury to one or the other and that does not involve the use of a weapon." 20 Ill. Adm. Code 504 App'x A. [47] at ¶ 33. The Adjustment Committee's basis for the ruling included the statement that plaintiff admitted "to having a physical altercation with Inmate Shepard K52138 on the GP yard" and that "Inmate Shepard stated that both he and Inmate Myles

were throwing punches at each other." [47] at ¶ 34. Defendants argue that if plaintiff was simply assaulted, as he claims here, it follows that the disciplinary board's findings are invalid; as such, they argue that his claims run afoul of *Heck*.

Plaintiff counters that his § 1983 claims are not inconsistent with the Adjustment Committee's decision that he was guilty of "fighting." As plaintiff points out, the Code's definition of fighting does not require a finding that plaintiff initiated the altercation with Shepard, and "throwing punches" *after* Shepard began the altercation would still constitute a violation of the offense. The court agrees. As the Seventh Circuit has held, "Prisoners lack even a right to invoke self-defense in disciplinary proceedings when they have resorted to violence as a means of protecting themselves." *Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015); *see also Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994) (not allowing self-defense claims in the context of prison disciplinary proceedings "acts as a deterrent because a prisoner who is caught fighting cannot reliably exculpate himself later with a claim of self-defense"). It is because prisoners' liberty is so constrained that "it is defendants who have the duty to protect a prisoner once they become aware he is in danger of assault by another prisoner, and this is a now well-settled aspect of Eighth Amendment jurisprudence." *Gevas*, 798 F.3d at 484.

The validity of the Adjustment Committee's decision that plaintiff was guilty of "fighting" because he was "throwing punches" at Shepard is consistent with plaintiff's claim, that defendants failed to prevent the fight by protecting plaintiff from Shepard. As such, defendants' *Heck* argument is without merit and the court will proceed to the merits of plaintiff's failure to protect claim.

II. Failure to Protect.

Defendants' next argument is that summary judgment should be granted because plaintiff has failed to establish a genuine issue of material fact that defendants' are liable for failing to protect him from Shepard. As the Seventh Circuit has held, "[a] prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994)). "A claim that a prison official was deliberately indifferent to such a risk has both an objective and a subjective component. First, the harm to which the prisoner was exposed must be an objectively serious one." *Gevas*, 798 F.3d at 480 (internal quotations omitted). Second, "the subjective prong of the deliberate indifference claim . . . requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id*. (internal quotations omitted). Defendants contend that the undisputed facts support summary judgment based on both prongs.

A. Objective Prong.

With regard to the first prong, plaintiff points out that a beating constitutes "serious harm," see *Brown*, 398 F.3d at 910-11, and that his report of being hit fifteen to twenty times constitutes a "beating." While not disputing that the harm plaintiff testified that he suffered was

5

"serious," defendants contend there is insufficient evidence to show that there was a "substantial risk" that plaintiff would suffer a beating at the hands of Shepard. As evidence, they point to plaintiff's own testimony that he was not afraid of Shepard, as well as his actions demonstrating this lack of fear: specifically, plaintiff went to the yard knowing Shepard might be there, he did not notify staff after being approached by Shepard twice, and he did not notify correctional staff about the altercation immediately after it occurred. On the other hand, plaintiff points to the fact that he was threatened by Shepard and was concerned enough about the risk of assault that he wrote letters to Officer Thompson and Warden Chandler.

At this stage, construing the facts in the light most favorable to plaintiff, the court agrees with plaintiff that he has raised a genuine issue of fact that there was an objective risk of serious harm. The Seventh Circuit has noted that "a 'mere possibility of violence' or the occurrence of a random act of violence is not sufficient to impose liability on prison officials" under the objective prong. *See Miller v. Turner*, 26 F. App'x. 560, 563 (7th Cir. 2001). Here, in contrast, Shepard's assault was not "a random act of violence" or a mere abstract "possibility," but rather the product of Shepard's intention, an intention he specifically communicated to plaintiff. As such, plaintiff has proffered sufficient evidence to survive summary judgment as to the first, objective prong.

B. Subjective Prong.

Next, defendants contend that summary judgment should be granted as to the second prong, whether they were deliberately indifferent to the risk. The Seventh Circuit has held that "[a]lthough this inquiry focuses on an official's subjective knowledge, a prisoner need not present direct evidence of the official's state of mind: Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Gevas*, 798 F.3d at 480 (internal quotations omitted). "In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas*, 798 F.3d at 480 (internal quotations and alterations omitted).

Here, plaintiff contends that he satisfied this prong by sending identical letters to Warden Chandler and Officer Thompson, letters that "complained to prison officials about a specific threat to his safety." *See id.* Defendants raise two challenges. First, they contend that there is insufficient evidence that the letters were ever received. Second, they contend that the content of the letters were insufficient to put defendants on notice of a substantial risk of serious harm.

1. Whether Defendants Received the Letters.

Defendants contend that there is insufficient evidence to raise a genuine issue of fact that Warden Chandler or Officer Thompson even received these letters prior to the March 28, 2013 altercation. As an initial matter, the court notes that the Seventh Circuit has held that "an inmate's letters to prison administrators may establish a basis for § 1983 liability." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). However, the Seventh Circuit has explicitly not established "an ironclad rule that any prisoner communication to a prison official anywhere in the corrections hierarchy constitutes adequate notice to the official of a violation of the Eighth

Amendment." *Id*. Rather, "[t]he plaintiff still has the burden of demonstrating that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Id.* (internal quotations omitted). As such, the "manner of transmission" may affect whether there is sufficient evidence to find that the prison official even received the inmate's complaint. *See id.*

With regard to Officer Thompson, the letter purportedly sent to him was produced in discovery. Although Officer Thompson testified that he does not recall receiving the letter, plaintiff testified that Officer Thompson visited plaintiff after the March 28, 2013 altercation and stated that he had read the letter, apologized for not acting on it, and stated that the reason he did not act on it was another pressing matter he had to attend to. As such, there is direct evidence that, if believed, reveals that Officer Thompson did read plaintiff's letter. Thus, there is no basis for summary judgment with regard to Officer Thompson regarding receipt of the letter.

With regard to Warden Chandler, the issue is more difficult. The letter to Warden Chandler was not found, although plaintiff testified that it was sent prior to the March 28, 2013 altercation and was substantially identical to the one sent to Officer Thompson. Warden Chandler testified that she does not recall receiving the letter, and plaintiff testified that he never spoke to her about his letter. Warden Chandler testified as to her usual practice regarding inmate communications:

> If it actually was placed in the mail and it came through institutional mail to my office, my secretary actually reviewed my mail and sent it to the approp – if it was something that needed to be dealt with, she would deal with it, if it was within her ability to deal with, or she would assign it or send it to the appropriate department head to address. I don't always get inmate mail.

[49-1] at 9. As such, the evidence pertaining to Warden Chandler's receipt of the letter is plaintiff's testimony that he sent the letter by institutional mail to Warden Chandler, as well as her testimony that she sometimes, but not always, reads inmate mail. While plaintiff argues that this evidence presents a genuine issue of fact as to receipt, defendants contend that the evidence is insufficient to survive summary judgment, relying on two Seventh Circuit decisions for support. Each case is worth examining in depth.

First, defendants point to *Vance v. Peters*, 97 F.3d 987 (7th Cir. 1996). In *Vance*, the plaintiff inmate testified that she wrote a letter to the prison Warden regarding prison officials' failure to treat her for a broken arm. The Seventh Circuit found that there was insufficient evidence for the plaintiff to survive summary judgment. Specifically, the Seventh Circuit noted that the plaintiff "claims to have written to the warden but also claims that, during the same period, she was unable to use her arm to fill out a routine request for medical attention. More importantly, she does not supply, in her description of the purported letter, any detail to permit the conclusion that the letter sufficiently advised the warden of the situation to require her intervention." *Id*. at 994. Examining the evidence further, the Seventh Circuit found that:

> The lapses in her own testimony are not cured by other evidentiary submissions. There is no corroborative evidence with respect to the letters that [the plaintiff]

7

says that she sent to the defendant officials. She had no copy of a letter and no letter was produced from any other source. One of the prisoners who allegedly wrote on her behalf, Tammy Fyke, gave a deposition; however, [the plaintiff's] counsel never asked her whether she wrote such a letter. Tammy Evans, the other inmate who was named by [the plaintiff], never gave a deposition. No letter was produced. The warden was not deposed. Under these circumstances, we cannot say that there is sufficient evidence to permit a jury to determine that the warden was sufficiently alerted of a lapse in [the plaintiff's] treatment as to require her intervention or further investigation.

*Id*. As is clear from the court's analysis, the primary factor in granting summary judgment was the lack of evidence as to the content of the letter. The court did discuss the fact that the plaintiff's testimony that she sent the letter was weakened by inconsistencies and a lack of corroboration, but the court specifically found that the lack of detail as to the content of the letter was the "more important" factor.

Defendants also point to *Johnson v. Snyder*, 444 F.3d 579 (7th Cir. 2006) (overruled on other grounds). In *Johnson*, the plaintiff filed a grievance complaining that his medical needs were not being met, the grievance was denied, and plaintiff appealed the denial. Plaintiff apparently testified that in conjunction with his grievance appeal he wrote letters to the Director of the IDOC. Plaintiff later sued the Director, arguing that he was deliberately indifferent to his medical needs. The Seventh Circuit found that summary judgment was proper despite the plaintiff's testimony that he sent the Director letters along with his grievance appeal:

Critically, there is no evidence that [the Director] actually read [the plaintiff's] communications or had any subjective awareness of [the plaintiff's] condition. To the contrary, there is evidence that [the Director] does not review inmate correspondence relating to grievances; that task is delegated to subordinates. Thus, [the plaintiff] has not shown that [the Director] personally facilitated, approved, condoned, or turned a blind eye to [the plaintiff's] situation. Summary judgment for [the Director] was therefore warranted.

*Id*. at 584 (internal citations omitted). It is clear from the court's analysis that the evidence showed that the Director delegated all communications of the relevant type to subordinates; thus, there was no evidence for receipt, and strong evidence against receipt.

The facts here are distinguishable from *Vance* and *Johnson*. Unlike in *Vance*, there is no evidence clearly casting doubt on plaintiff's testimony that he did mail a letter to Warden Chandler. Unlike in *Johnson*, there is no clear evidence that Warden Chandler would not have read plaintiff's letter; while she did testify that "I don't always get inmate mail," this is not nearly as strong as the evidence in *Johnson* that the Director *never* got inmate mail.

After review, the court agrees with plaintiff that there is a genuine issue of fact as to whether Warden Chandler received his letter. As plaintiff notes, the Seventh Circuit has held that prison officials cannot "take refuge in the zone between ignorance and actual knowledge." *Mayoral v. Sheahan*, 245 F.3d 934, 940 (7th Cir. 2001). Without clear precedent to the contrary,

8

it would be improper to take a disputed factual question away from the jury simply because Warden Chandler did not recall receiving the letter at the time of her testimony. Thus, the court will move on to analyze the contents of the letter.

2. Whether the Letters Put Defendant's on Notice of a Substantial Risk of Serious Harm.

Next, defendants contend that, even if received, the identical letters were insufficient to create an inference that Warden Chandler or Officer Thompson had actual knowledge of a serious risk. Defendants argue that plaintiff's letter was not specific enough to put defendants on notice that there was an actual serious risk. Defendants also argue that plaintiff's complaints were not credible. Specifically, they argue that the letter is internally inconsistent, in that plaintiff claimed to be worried about an assault from Shepard but simultaneously claimed to be "cool" with his housing assignment. Further, they note that plaintiff testified that he was not "afraid" of Shepard or anyone in prison. Finally, they argue that plaintiff was the aggressor in the initial altercation between the two inmates, despite plaintiff's testimony that the initial altercation occurred because Shepard was angry with plaintiff over plaintiff's lower bunk permit.

As the Seventh Circuit explained in *Gevas v. McLaughlin*, 798 F.3d 475 (7th Cir. 2015), the most important factor to analyzing the subjective second prong, particularly at the summary judgment stage, is whether the inmate's complaint was specific enough to put prison officials on notice that there was a substantial risk of serious harm. Also important is whether the complaint is credible, which can be undercut by inconsistent statements from the inmate. The court's explanation and supporting authority are worth quoting in full:

> Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger. *See, e.g., Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("[The prisoner's] vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."); *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what the threats were); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (prisoner did not mention to guards that he was perceived to be a "snitch" or otherwise apprise them of a specific threat to his life); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (prisoner only stated vaguely that he was "having problems" in his cellblock and "needed to be removed"). Nor will complaints that are contradicted by the prisoner himself suffice to establish knowledge. *See, e.g., Riccardo v. Rausch*, 375 F.3d 521, 527 (7th Cir. 2004) (prisoner initially expressed mortal fear of harm at hands of cellmate, but subsequently indicated to guard he had no concern). By contrast, a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk. *See, e.g., Haley v. Gross*, 86 F.3d 630, 643 (7th Cir. 1996) (prisoner advised sergeant, inter alia, that cellmate was intimidating him, acting strangely, had threatened that

"something crucial was going to happen" if one of them was not moved, and was now "deadlocked" in cell, which restricted ingress to and egress from cell).

*Gevas*, 798 F.3d at 480-81 (internal quotations omitted).

In *Young v. Monahan*, 420 Fed. Appx. 578 (7th Cir. 2011), the Seventh Circuit explained that credibility is an important factor in the analysis:

> Although specific facts showing that a defendant's awareness of a risk of harm are sufficient to defeat summary judgment, *Peate v. McCann*, 294 F.3d 879 (7th Cir. 2002), "prison guards are not required to believe every profession of fear by an inmate." *Lindell v. Houser*, 442 F.3d 1033, 1035 (7th Cir. 2006); *see also Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (noting that likelihood of actual knowledge of impending harm decreases as the vagueness of the threat increases); *Riccardo v. Rausch*, 375 F.3d 521, 527–28 (7th Cir.2004) ("A prisoner's bare assertion is not enough to make the guard subjectively aware of a risk, if the objective indicators do not substantiate the inmate's assertion.")

*See Young v. Monahan*, 420 Fed. Appx. 578, 581-82 (7th Cir. 2011). Importantly, the court found that summary judgment for the defendant prison official was supported in part by the fact that the objective indicators made the plaintiff's complaints less credible. Specifically, one of the defendants was a prison official to whom the plaintiff complained about a threat from another inmate. Months later, the plaintiff was transferred to a cell with the other inmate, who subsequently assaulted him. When the plaintiff argued that the prison official failed to protect him by not stopping the cell assignment, the court found it relevant that:

> [the assailant had not] acted on his threats when he lived in the same housing unit as [the plaintiff] in the months leading up to the cell assignment. *See Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010) (noting that assailant's past conduct is probative of whether he posed risk to victim).

*Young*, 420 Fed. Appx. at 582.

Again, the letter provided in discovery states as follows:

[page one]

3/13/13

Greetings, Mr. Thompson,
    This is Eddie Myles #A-71068 in #58 Cell "01."
    I dropped a kite in the "Outgoing Mail Box" for you. So, this is concerning the same "thing."
    Short, brief, and to the point!
    Several guys I know have came up to "me" and said; whenever you "see" your x-cellie, watch "him" because he's "talking about what he's gonna do to

10

you, when he "catches you right" over in the "gym." So, be "careful." Or on that "yard."

After hearing this: I naturally looked at the "yard and gym" schedule. He's now in "31." I'm in #58. We have "yard together for sure," or at least while he's in "31" anyway.

I'm not trying to get "shot" on the yard, or "hurt." I'm giving you my word that if I do have to raise my hands at my x-cellie, I will do it "defending myself." I will try as best I can to "keep" some "distance" between us." I just "wanted" you to know my x-cellie is "talkin crazy," Hey." We'll "talk."

[page two]

Between "us" I'd rather be in a "2-Man" "Cell," but I'm OK "Where I am" for now.

I would really appreciate it if I could get back to "60" or "26"? But, if I can't "I'm cool where I am."

God knows I don't want "Any-problems."

Just thought I'd let you know "before something happens" "what" I'm "hearing." "We'll talk"…

To: Mr. Thompson.
"I.A."

[42-5].

Taking all inferences in favor of plaintiff, these complaints are specific enough to put defendants on notice of a substantial risk of serious harm. The letter specifically stated that Shepard had threatened to harm him in a common area, including the yard. Plaintiff also pointed out that he was on the same yard schedule as Shepard. Plaintiff stated that he would try to keep his distance, but was worried about getting "shot" or "hurt" on the yard. These complaints are similar to those articulated in *Gevas*, where the court held that the plaintiff gave information "sufficient to communicate the essential nature of the threat" when he "did manage to apprise [the official] that his cellmate was threatening to stab him." *See Gevas*, 798 F.3d at 481-82. As such, defendants' argument that the letter was too vague are not sufficient at the summary judgment stage.

Defendants' arguments that plaintiff's letter is not credible are also not sufficient at the summary judgment stage. First, plaintiff's claim that he was "cool" with his housing assignment appears to be separate from his worry that Shepard would attack him in a common area. Plaintiff's testimony that he was not "afraid" of anyone in prison, including Shepard, was a general statement that is not inconsistent with his specific belief that Shepard would attack him; further, any lack of fear was not communicated to defendants through the letter or otherwise. Finally, regardless of who initiated the first altercation, plaintiff's letter is entirely consistent with Shepard wanting to harm him out of revenge for that incident.

Officer Thompson points out that prison officials do not have to believe every inmate's complaint, and he argues that subjectively he did not believe Shepard was a threat to plaintiff.

However, Officer Thompson's state of mind is a disputed fact by virtue of the fact that plaintiff testified that Officer Thompson admitted to him that he read the letter, apologized for not acting on it, and that he should have taken action and investigated the incident but was too busy. Again, as the Seventh Circuit in *Gevas* explained:

> It is true that the defendants were not required to believe that [the plaintiff] was in danger. For any number of reasons, including information acquired in the course of any investigation into [the plaintiff's] complaints, the defendants might have concluded either that [the plaintiff] was not credible or that [the assailant] did not present a genuine threat to his safety. In other words, [the plaintiff's] testimony, even accepted as the truth, does not compel the finding that any of the defendants did draw the inference that [the plaintiff] faced a substantial risk of serious harm. But for purposes of [judgment as a matter of law], the question is not whether the finder of fact was compelled to determine or would have determined that the defendants were actually aware of the danger, but whether it could have made that finding.

*Gevas*, 798 F.3d at 482. Here, taking all inferences in favor of plaintiff, he has proffered sufficient evidence from which a jury could find that defendants failed to protect him. As such, the court will move on to defendants' final argument.

III. Qualified Immunity.

Finally, defendants contend that both are protected by qualified immunity because the purported constitutional violations plaintiff points to in his claims were not clearly established. More specifically, defendants argue that it would require a change in the law to find that plaintiff's letter was sufficient to put them on notice of a substantial risk of serious harm. The court disagrees. As the court has found, applying ordinary summary judgment review and clearly established law pertaining to failure to protect claims, plaintiff has raised a genuine issue of fact that defendants were deliberately indifferent to plaintiff's objectively substantial risk of serious harm. *See Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (plaintiff is not invariably required to point to case with similar facts in order to demonstrate that right at issue was clearly established for purposes of qualified immunity; "the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional"). As such, defendants' qualified immunity argument must fail.

For the foregoing reasons, defendants' motion for summary judgment [40] is denied. At the next hearing, the parties are to discuss with Judge Johnston the possibility of a settlement conference.

ENTER:

Date: 9/12/2017

*Philip G. Reinhard*
United States District Court Judge

Electronic Notices. (LC)